# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-495

**KATHY PREJEAN**

**VERSUS**

**WALTER GUILLORY, ET AL.**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20044905
HONORABLE J. BYRON HEBERT, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**REVERSED AND RENDERED.**

**Richard Ramsey Kennedy**
**Attorney at Law**
**Richard Ramsey Kennedy, III**
**Attorney at Law**
**P. O. Box 3243**
**Lafayette, LA 70502-3243**
**(337) 232-1934**
**Counsel for Plaintiff/Appellant:**
**Kathy Prejean**

**Charles Kirkland Middleton**
**Attorney at Law**
**P. O. Box 53629**
**Lafayette, LA 70505**
**(337) 234-0701**
**Counsel for Defendant/Appellee:**
**Walter Guillory**
**The Lafayette Housing Authority**

**Daniel James Stanford**
**Attorney at Law**
**117 Caillouet Place**
**Lafayette, LA 70501**
**(337) 232-2272**
**Counsel for Defendant/Appellee:**
**Walter Guillory**
**The Lafayette Housing Authority**

**SAUNDERS, Judge.**

This is a case in which an employee of a former housing authority claims that her employment contract was enforceable against the entity that existed subsequent to the consolidation or merger of the former housing authority with a regional or consolidated housing authority. The employee claims that the regional or consolidated housing authority breached that contract by firing her prior to the term of her contract ending.

After a trial on the merits, the trial court found by applying La.Civ. Code arts. 1821 and 1823 that the employee failed to carry her burden to prove that her employment contract was assumed by the regional or consolidated housing authority. The employee appealed this judgment, alleging an error of law by the trial court by failing to consider La.R.S. 40:417. We reverse the trial court's judgment and, after a *de novo* review of the record, render a judgment for the employee.

**FACTS AND PROCEDURAL HISTORY:**

In October of 1994, Kathy Prejean (Prejean) began working for the Broussard Housing Authority (BHA) without a contract. Prejean worked on the BHA's Section 8 public housing. At the time of her hire, the BHA had only seventy-two homes that were owned by landlords and were occupied by tenets. Section 8 housing is a tenant-based program financed with vouchers consisting of federal funds through the Department of Housing and Urban Development (HUD) to provide suitable housing for tenants in homes offered by approved homeowners/landlords. On February 15, 1995, the BHA hired Prejean as its Executive Director under a written contract for an initial five-year term, with the contract having a provision for an extension period for another five years.

When Prejean began working for the BHA in 1994, it was a "troubled" agency.

A "troubled" agency is one that fails to use a certain percentage of all of its federally available funds to provide housing for tenants. After Prejean became the BHA's Executive Director, it was never again classified as a "troubled" agency.

At HUD's request, the BHA consolidated with the Vermillion Parish housing program. Prejean remained as the BHA Executive Director and, with this consolidation, was serving as the Executive Director of nearly 650 vouchers. On January 3, 2002, the BHA extended Prejean's contract for up to seven years.

In early 2004, the BHA decided it wanted to transfer its Section 8 Housing program to the Lafayette Housing Authority (LHA). At the time, the BHA consisted entirely of Section 8 Housing. On April 13, 2004, the BHA held a meeting at City Hall in Broussard, Louisiana, where it approved a resolution to offer its Section 8 Housing to the LHA. Several members of the LHA attended that meeting, and subsequent to the BHA passing the resolution to transfer the Section 8 Housing, the LHA conducted a meeting wherein it accepted the BHA's offer. The next day, Dominick Pittari, the New Orleans HUD Director, wrote the BHA's chairperson advising that the BHA and the LHA had to comply with La.R.S. 40:411 for this consolidation.

The LHA and the BHA responded on August 26, 2004, by filing a joint, *ex parte*, petition for declaratory judgment in the Fifteenth Judicial District Court for Lafayette Parish asking the court to find that La.R.S. 40:411 did not apply to the transfer of the BHA Section 8 Housing program to the LHA. On August 30, 2004, the petition was granted. Thereafter, the LHA exercised control over the BHA Section 8 Housing program, and Prejean continued with her duties. In November of 2004, Walter Guillory, the Executive Director of the LHA, assigned Tim Declouet to the

BHA, in order to assess how the transition was going, to report to him, to stay in the Broussard office on a regular basis, and to serve as his "eyes and ears."

That same month, Prejean was diagnosed with cancer of her right breast, for which she had a mastectomy. Prejean's doctors gave her excuses from work after her November 2004 surgery until January 10, 2005. Then in February of 2005, Prejean was diagnosed with cancer of the left breast. On February 16, 2005, she had her left breast removed. Doctors then excused Prejean from work until July 25, 2005.

According to Prejean and her coworkers, despite the excuses from work, she continued working against her doctors' advice, even though Declouet would, at times, tell her to go home and to continue doing things at the Broussard office as she had been doing them, as things were going smoothly. Prejean did so because she described herself as a workaholic who remained in daily contact with her office. Prejean and her coworkers testified that Prejean would either do her work at home or in the office, but that the work was completed adequately. Further, according to Prejean, she continued to work against her doctors' orders because the work would keep her mind off of her medical condition.

In May of 2005, Guillory, then with knowledge of Prejean's illness, looked into the human resource department's medical file on Prejean and discovered that she was excused from work until July of that year. Without speaking with Prejean or Declouet to determine whether Prejean was actually doing her work, or if she was actually missing any time from her job, Guillory brought Prejean's absenteeism to the LHA's attention. On May 17, 2005, the LHA passed a resolution to terminate Prejean due to excessive absences. It sent Prejean a letter informing her of her termination that same day.

3

On October 5, 2005, Prejean filed suit against Guillory and the LHA alleging tort claims and seeking a declaratory judgment that her employment contract with the BHA had survived the consolidation/merger between the BHA and the LHA. Further, after supplementing her petition, Prejean alleged that her employment contract was enforceable against the LHA, and that she was entitled to damages for the LHA's breach of her employment contract. After an extensive trial on the merits, the trial court dismissed all of Prejean's claims based on her failure to carry her burden of proof as to any negligence by the LHA or Guillory. The trial court also found that Prejean failed to carry her burden to prove that she was entitled to enforce her employment contract against the LHA.

Prejean filed this appeal alleging that the trial court committed legal error in failing to apply La.R.S. 40:417. Prejean also alleges that should La.R.S. 40:417 be correctly applied to her claims, she is entitled to enforce her contract against the LHA and that she is entitled recovery of her wages, car allowance, health benefits, and any and all other benefits she received under the terms of her employment contract.

**STANDARD OF REVIEW:**

An appellate court's review of a question of law is a simple decision whether the lower court's decision is legally correct. *Jim Walter Homes, Inc. v. Jessen*, 98-1685 (La.App. 3 Cir. 3/31/99), 732 So.2d 699. If the lower court bases its decision on an erroneous application of law, that decision is not entitled to deference. *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067 (La.1983). When such an error of law is committed, the appellate court should conduct a *de novo* review of the record. *Lasha v. Olin Corp.*, 625 So.2d 1002 (La.1993).

4

**DISCUSSION OF THE MERITS:**

Prejean argues that the trial court committed legal error by ruling that she was not entitled to enforce her employment contract with the BHA under La.Civ.Code arts. 1821 and 1823, rather than the trial court finding that she was entitled to enforce the employment contract against the LHA under La.R.S. 40:417. First, we will determine whether the trial court made an error of law by applying La.Civ.Code arts. 1821 and 1823 rather than by applying La.R.S. 40:417. We find that Prejean's claim of an error of law has merit.

In the case before us, the trial court, in its reasons for ruling, stated:

> A trial on the merits of this matter commenced on December 15, 2008 and was taken under advisement by the Court. After considering the evidence the Court finds as follows:
>
> (1) The plaintiff has failed to prove by a preponderance of the evidence that the [LHA] assumed her employment contract with the [BHA] after the entities merged. The plaintiff argues that after [the LHA's] consolidation with the [BHA], her employment contract was assumed by the new entity, was valid, enforceable, and a lawful obligation of the [LHA]. Plaintiff alleged her contract was improperly terminated and sought the enforcement for the completion of the contract.
>
> Plaintiffs Exhibit (KP-23) is a purported resolution whereby [the LHA's] board accepted all obligations of the [BHA] and was signed by the Board's Chair, Erwin "Buddy" Webb. However, at trial, Webb testified a valid resolution required a quorum, signatures from the board and minutes. Subsequently, the evidence showed Webb was the only signatory on the resolution and no evidence was submitted to support any meeting to discuss the resolution occurred. Furthermore, defendants cited La. CC Arts 1821 and 1823 which states the enforcement of an obligation by an obligee against a third party must be in writing. Since a quorum is required for the board to pass any resolution, Webb's unilateral acceptance of the purported was invalid. Consequently plaintiff's claims of improper termination and unlawful eviction must be rejected.

It is clear from the trial court's reasons for ruling that it found Prejean's exhibit KP-23 was not a valid resolution of the LHA accepting the obligations of the BHA

5

due to no evidence that the purported resolution complied with La.R.S. 40:401. Given this finding, the trial court then cited La.Civ.Code arts. 1821 and 1823 as influence for its eventual conclusion that Prejean's claim to entitlement under her existing employment contract must fail.[1]

Prejean argues that the trial court's analysis fails to consider La.R.S. 40:417. Louisiana Revised Statutes 40:417 states:

> A. The governing body of a parish or municipality shall not adopt a resolution pursuant to the provisions of R.S. 40:411 or 413 if there is an existing housing authority therefor which has any obligations outstanding unless:
>
>> (1) All obligees of the existing housing authority and the parties to its obligations consent in writing to the substitution of the regional or consolidated housing authority therefor on all such obligations.
>>
>> (2) The commissioners of the existing housing authority adopt a resolution consenting to the transfer of all the rights, obligations and property thereof to the regional or consolidated housing authority.
>
> B. When the two conditions in Subsection A are complied with and the regional or consolidated housing authority is created and authorized to exercise its powers and perform its functions, all rights, obligations and property of the former housing authority shall vest in the regional or consolidated housing authority and be in its name. All rights and

---

[1]Louisiana Civil Code Article 1821 states:

> An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing.

> The obligee's consent to the agreement does not effect a release of the obligor.

> The unreleased obligor remains solidarily bound with the third person.

Louisiana Civil Code Article 1823 states:

> An obligee and a third person may agree on an assumption by the latter of an obligation owed by another to the former. That agreement must be made in writing. That agreement does not effect a release of the original obligor.

obligations of the former housing authority shall be the rights and obligations of the regional or consolidated housing authority and may be asserted and enforced by or against the regional or consolidated housing authority as they might have been asserted and enforced by or against the former housing authority.

"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature" La.Civ.Code art. 9. We find the language of La.R.S. 40:417(B) to be unambiguous. When two housing authorities consolidate or merge, under operation of La.R.S. 40:417(B), the regional or consolidated housing authority shall become responsible for the obligations of the former housing authority.

"In interpreting . . . conflicting statutes, the more specific will control over the general." *Dupont v. State, Dept. of Transp. and Dev.*, 01-188, p. 2 (La.App. 3 Cir. 10/3/01), 797 So.2d 776, 777. Louisiana Revised Statutes 40:417 deals specifically with the situation that arose *sub judice*, i.e. when two housing authorities consolidate, while La.Civ.Code arts. 1821 and 1823 deal with general obligation law regarding assumptions. When this particular situation arises, our Legislature's will is expressed more clearly by La.R.S. 40:417. Thus, we find that the proper applicable statute to the case before us is La.R.S. 40:417, and that Prejean was correct in her assertion that the trial court committed an error of law by failing to consider La.R.S. 40:417 in reaching its determination.

The LHA counters that Prejean cannot make this argument on appeal, asserting that it is outside of her pleadings, trial testimony, or evidence. The LHA's position is without merit.

Our supreme court, in *Hill v. North-Central Area Vocational Technical School*,

7

310 So.2d 104, 106 (La.1975), stated:

> The law applicable to a correct interpretation of the allegations of plaintiffs' petitions is very elementary. In Louisiana, no technical forms of pleading are required and simple allegations of fact are the sole requirement of a petition. [La.Code Civ.P. art. 854.] Pleadings are to be construed to do substantial justice. [La.Code Civ.P. art. 865.] The petition need only state material facts upon which the cause of action is based. [La.Code Civ.P. art. 891.]

Prejean requested a declaratory judgment that her employment contract with the BHA was enforceable against the LHA. In her supplemental petition, Prejean alleged damages due to the LHA's breach of her employment contract. Prejean's employment contract, the contract's addendum, and the BHA's resolution accepting both the employment contract and the addendum are exhibits in evidence.

Clearly, whether Prejean's employment contract was valid and enforceable against the LHA were issues raised by Prejean from the outset of this litigation. Louisiana's adoption of a fact pleading system does not require that she specifically plead which statute the court would or should rely upon in making its determination. *See Wright v. Louisiana Power & Light*, 06-1181 (La. 3/9/07), 951 So.2d 1058.

The LHA next argues that even if it is proper for this court to consider Prejean's argument regarding La.R.S. 40:417, the statute does not apply. One reason pointed to by the LHA for the inapplicability of La.R.S. 40:417 is the declaratory judgment that the BHA and the LHA obtained stating that their consolidation did not fall within the intent of La.R.S. 40:411. Thus, according to the LHA, it is logical that La.R.S. 40:417 also does not apply. We find this argument to be without merit.

Louisiana Revised Statutes 40:411, in pertinent part, states:

A. If the governing body of each of two or more parishes in the same general geographical location, regardless of their population, declares by resolution that there is a need for one regional housing authority for both or all of such parishes, a public body corporate and politic known

8

as a regional housing authority shall thereupon exist and exercise its powers and perform its functions in such parishes.

B. If the governing body of each of two or more municipalities, whether or not in the same general geographical location, declares by resolution that there is a need for one consolidated housing authority for both or all of such municipalities, a public body corporate and politic known as a consolidated housing authority shall thereupon exist and exercise its powers and perform its functions within its area of operation.

Louisiana Code of Civil Procedure Article 1880, in pertinent part, states, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." Prejean was not a party to the declaratory judgment obtained by joint, *ex parte*, petition of the BHA and the LHA. Should La.R.S. 40:411 not apply to the consolidation, neither would La.R.S. 40:417, and the LHA would not be bound by the BHA's contract with Prejean. Thus, this declaratory judgment affects Prejean's rights under her employment contract with the BHA. Therefore, given the language of La.Code Civ.P. art. 1880, this declaratory judgment does not affect Prejean.

Another argument raised by the LHA that La.R.S. 40:417 does not apply is that it is not a regional or consolidate housing authority as defined under La.R.S. 40:384 (23). We disagree.

Louisiana Revised Statutes 40:384 (23), states:

"Regional housing authority" or "consolidated housing authority," as the case may be, means a public body, corporate and politic, and a governmental subdivision of this state, formed by two or more parishes pursuant to the authority provided in R.S. 40:411(A), or by two or more municipalities pursuant to the authority in R.S. 40:411(B), exercising necessary and essential governmental functions for the purposes stated in this Chapter in matters of statewide concern, although its operations are local or regional in nature. It is a political subdivision of this state, independent from political subdivisions of this state which established

it or which may appoint some or all of its commissioners.

For the LHA to be a regional or consolidated housing authority as defined by La.R.S. 40:384(23), it must have first been two or more parishes or municipalities, that did some action to merge by authority provided in La.R.S. 40:411(A) or (B), for a purpose or purposes stated in Chapter 40 of the Louisiana Revised Statutes. Clearly, the BHA and the LHA are "two or more parishes," Lafayette Parish and Vermillion Parish, given the prior consolidation between Vermillion Parish and the BHA, or "two or more municipalities," the cities of Lafayette and Broussard. It is also clear that they merged for "the purposes stated in this Chapter." Louisiana Revised Statutes 40:382(4) is as follows:

> It is the goal and policy of this state that all its residents shall have access to decent, safe, sanitary, and affordable housing in safe and livable neighborhoods and it is the policy of this state to assure the availability, for rental or sale, of decent, safe, and sanitary housing that is affordable to all persons residing in this state.

The evidence in the record is such that both the LHA and the BHA concurred that the residents of the Broussard/Vermillion Section 8 housing would be better and more efficiently served by the transfer of the BHA's Section 8 housing to the LHA. While it could be argued that the BHA and the LHA did not intend to merge or consolidate because the BHA could have other assets and or liabilities other than their Section 8 housing, this is not the case. The BHA, in its entirety, consisted of Section 8 housing. After the transfer of its Section 8 Housing, the BHA dissolved, with its sole object of operation being taken over by the LHA. Clearly, this is a consolidation, regardless of the nomenclature assigned to it. Thus, we find that this second condition necessary for the LHA to be a regional or consolidate housing authority is met.

10

Finally, in order for the LHA to be defined as a regional or consolidated housing authority by La.R.S. 40:384(23), the BHA and the LHA must have acted under La.R.S. 40:411(A) or (B). We find that they have done so.

In the case before us, the record contains evidence of a resolution adopted by the BHA that stated:

> The [BHA] Board of Commissioners, all members present, and after duly considering and discussing the permanent transfer of the Section 8 Housing program to the [LHA] have voted by majority in favor of permanently transferring management and control of the Section 8 Housing program to the [LHA].
>
> Thus done and passed by the majority vote of the [BHA] Board of Commissioners.

This document was signed by the chairperson and four members of the BHA. We find this document to be conclusive evidence that a regional housing authority was "formed . . . pursuant to the authority provided in R.S. 40:411 (A) or, . . .R.S. 40:411(B)" with respect to the BHA, as it is clear that the BHA declared "by resolution that there is a need for one regional housing authority for both or all of such parishes [or municipalities]." La.R.S. 40:411.

Further, we find that the weight of the evidence in the record indicates that the LHA passed a similar resolution. The first evidence that such a resolution was passed is a document that states the following:

> BE IT RESOLVED, that the Commissioners of this said board, is hereby authorized and empowered for and on behalf of, and in the name of this said board, to accept transfer of the rights, title, interest, indebtedness and obligations of another local housing authority as the transferee of the assets and liabilities of such other board in dissolution.
>
> BE IT FURTHER RESOLVED, that by resolution dated          , this said board accepted the request of the [BHA], to assume as transferee, the assets, liabilities and obligations of thats [sic] said board;

11

BE IT FURTHER RESOLVED, that this said board has concurred that the residents of the Broussard/Vermillion area will be better and more efficiently served by this transfer and the governing bodies of the municipalities have consented to the dissolution and transfer,

BE IT FURTHER RESOLVED, that we hereby authorize the chairperson of this said board or the Executive Director of this said board, as the chairperson deems appropriate, to take any action and execute any documents as shall, in his discretion and judgment, be necessary to ensure a smooth transition without undue interruption of services during the dissolution and transfer,

BE IT FURTHER RESOLVED that this board accepts the rights, assets, interests and obligations of the [BHA], and do by such acceptance agree to defend any action, the current Board of Commissioners of the [BHA], together or individually for any such action taken in their capacity as commissioners of said authority or acting in the interest of, or on behalf of said authority; further to indemnify said commissioners(s) for any costs, fees or expenses otherwise expended by them for any action taken by them acting in said capacity.

I certify that I am the duly acting Chairperson of the Board of Commissioners and the above and forgoing constitutes a true and correct copy of the resolution duly adopted at a meeting of the Board of Commissioners held on the 23rd day of November, 2004, at which meeting a quorum was present and voted in favor of said resolution and said resolution have never been modified or rescinded and it still in full force and affect.

This document, exhibit KP-23 referred to by the trial court in its reasons for judgment, was signed by the then-chairperson of the LHA, Erwin "Buddy" Webb, and dated November 23, 2004. It was admitted into evidence by stipulation that Webb would testify that the document was prepared in the HUD office, that it was sent to him for his signature and approval, and that he signed the document.

The LHA argues, and the trial court agreed, that this document was not a legal resolution under La.R.S. 40:401 because it is not signed by any of the LHA's commissioners, i.e. it did not comply with the language of La.R.S. 40:401 that states,

12

"[a] majority of the commissioners shall constitute a quorum of the authority for the purpose of conducting its business and exercising its power and for all other purposes."[2]

While this may be true that this particular document is not a legal resolution of the LHA under La.R.S. 40:401, the document does constitute evidence in the record that tends to show that a resolution was passed for the purpose of the LHA to consolidate with the BHA. This evidence is corroborated first by Guillory's testimony, as follows:

> Q    Was there a vote and resolution passed by both boards to transfer Section 8 housing from Broussard Lafayette Housing?
> A    Yes.
>
> Q    And that was done on the 13th of April [2004]?
> A    Yes, sir.

Moreover, Guillory's testimony and KP-23 are corroborated by exhibits D-5 and D-6. Exhibit D-5 is an apparent excerpt from the minutes of a LHA meeting, that states, "[t]he [LHA] Board of Commissioners and Chairperson held a meeting and wherein they discussed the [BHA] Resolution. The [LHA] voted unanimously in favor of accepting the permanent transfer of [BHA's] Broussard and Vermillion Section 8 Housing." Exhibit D-6 is a resolution of the LHA that states, "The [LHA] Board of Commissioners, all members present, and after duly considering and

---

[2]Louisiana Revised Statutes 40:401, in its entirety, states:

> The powers of each local housing authority shall be vested in its commissioners. A majority of the commissioners shall constitute a quorum of the authority for the purpose of conducting its business and exercising its power and for all other purposes. Except for any matter with respect to which the resolution creating the authority or its bylaws requires a higher number or proportion of votes, action may be taken by the authority upon the vote of a majority of the commissioners present and voting.

discussing the [BHA] Resolution vote unanimously in favor of accepting the permanent transfer of all Section 8 Housing under the control of [BHA]." The resolution was signed by the chairperson and four members.

It is clear that the LHA passed a resolution that satisfies La.R.S. 40:411. The LHA "declare[d] by resolution that there is a need for one regional housing authority for both or all of such parishes [or municipalities]." La.R.S. 40:411.

Thus, the actions of the BHA and the LHA fit the requirements of La.R.S. 40:384(23) in order for the LHA to be defined as a regional or consolidated housing authority. It is apparent to this court that the LHA and the BHA agreed to have the LHA be a public body that exercises a governmental function consistent with a purpose stated in Chapter 40. As such, the LHA's argument that it is not a regional or consolidated housing authority as defined in Chapter 40 must fail.

Next, the LHA argues that, even if we find that it was a regional or consolidated housing authority, La.R.S. 40:417 does not apply because Prejean failed to prove that the prerequisites of La.R.S. 40:417(B) found in 40:417(A)(1) were met. Namely, the LHA contends that there is no evidence in the record that Prejean proved that she consented, in writing, to the substitution of the LHA in place of the BHA with respect to the BHA's obligations to her under her employment contract.

While the LHA is correct, this lack of evidence makes Prejean's employment contract with respect to the LHA relatively null. Louisiana Civil Code Article 2031 states:

> A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.

14

Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.

The requirement of La.R.S. 40:417(A)(1) that Prejean, as an obligee of the BHA, consent in writing to the LHA's substitution in place of the BHA for the obligations that exist in Prejean's employment contract is in place to protect Prejean's interest in her employment contract. Thus, under La.Civ.Code art. 2031, only Prejean can invoke this nullity. Further, it is clear that Prejean has cured this relative nullity via confirmation. Louisiana Civil Code Article 1842 states:

Confirmation is a declaration whereby a person cures the relative nullity of an obligation.

An express act of confirmation must contain or identify the substance of the obligation and evidence the intention to cure its relative nullity.

Tacit confirmation may result from voluntary performance of the obligation.

The record indicates that Prejean continued to work after the consolidation under the direction of the LHA. Her work was tacit confirmation of the substitution of the LHA for the BHA, as she voluntarily performed her obligations under her employment contract.

Finally, the LHA argues that La.R.S. 40:417 does not apply because Prejean did not prove that the BHA complied with La.R.S. 40:418. Louisiana Revised Statutes 40:418 states, "[w]hen the governing body of a municipality adopts a resolution declaring that there is a need within it for a consolidated housing authority, it shall promptly notify the mayor of the municipality of that adoption." We find this argument irrelevant.

15

The LHA argues that Prejean's failure to prove that the BHA informed the Mayor of Broussard of its intent to consolidate with the LHA indicates that the BHA did not intend to consolidate with the LHA. As we stated above, regardless of whether the BHA intention was to consolidate with the LHA, it is quite apparent that a merger or consolidation as contemplated by the statutory scheme set up by our Legislature occurred. The BHA transferred its sole object of operation, i.e. Section 8 housing, to the LHA and ceased to exist after the transfer. The LHA then exercised complete control over operation of the BHA's Section 8 housing. This is the very definition of what happens when two entities merge or consolidate.[3] Moreover, the legal notice published in the *Lafayette Daily Advertiser* on April 11, 2004, and posted on the door of the Broussard Town Council Chambers on April 12, 2004 at 3:45 PM both state that there was to be a meeting on April 13, 2004 at 6:00 PM where the sole item on the agenda was "Consolidation/Merger of the Broussard Housing Authority." Thus, this final argument by the LHA that La.R.S. 40:417 does not apply is also without merit.

Given that we find that the trial court failed to apply the correct statute, an error of law, we must now conduct a *de novo* review of the record to determine whether Prejean was entitled to recover from the LHA for breaching of her employment contract.

"The burden of proof in an action for breach of contract is on the party claiming rights under that contract." *Terry F. Day, Inc. v. Moore*, 01-1447, p.3

---

[3] *Merger*: The absorption of one organization that ceases to exist into another that retains its own name and identity and acquires the assets and liabilities of the former. *Black's Law Dictionary* (8th Ed.2004)(parenthetical omitted).

*Consolidation*: The act or process of uniting; the state of being united."*Black's Law Dictionary* (8th Ed.2004).

(La.App. 4 Cir. 3/27/02), 815 So.2d 335, 338. "Interpretation of a contract is the determination of the common intent of the parties." La.Civ.Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046.

Prejean's employment contract with the BHA, dated February 15, 1995, states, in pertinent part:

> [T]he [BHA] hereby retains and employs Kathy Prejean to be its Executive Director for a term of five (5) years commencing with the 15 day of February, 1995 and expiring February, 2000. In addition, it is further agreed by the parties hereto that this contact shall be extended for an additional five (5) years (the "extension period") upon the same terms and conditions at the option of the Executive Director, unless the [BHA] gives the Executive Director by December 1, 1999, notice in writing that it will not extend the contract due to the inadequate performance of the Executive Director. The Board may make a finding of inadequate performance, after providing the Executive Director with written notice and an opportunity to be heard, upon a determination that a significant adverse audit finding (or adverse management review) by federal or state funding agencies has gone uncorrected for more than sixty (60) days due to action or inaction by the Executive Director.

Prejean worked under this contract until January 1, 2002. On that date, the BHA and Prejean signed an addendum to her contract of employment. That addendum (emphasis in original) includes the following language:

> [T]he [BHA] hereby retains and employs Kathy Prejean to be its Executive Director for a term of four (4) years commencing with the 1st day of <u>January, 2002</u> and expiring <u>January 1, 2006</u>. In addition, it is further agreed by the parties hereto that this contact shall be extended for an additional four (4) years (the "extension period") upon the same terms and conditions at the option of the Executive Director, unless the [BHA] gives the Executive Director by <u>October 1, 2005</u>, notice in writing that it will not extend the contract due to the inadequate performance of the Executive Director. The Board may make a finding of inadequate performance, after providing the Executive Director with written notice and an opportunity to be heard, upon a determination that a significant adverse audit finding (or adverse management review) by

17

federal or state funding agencies has gone uncorrected for more than sixty (60) days due to action or inaction by the Executive Director.

. . . .

The [BHA] shall pay the Executive Director an [sic] monthly salary of $7000.00 and a car allowance of $500.00. Determined by the Authority Board, consistent with U.S. Department of Housing and Urban Development and [BHA] guidelines. Annual salary with a cost of living of 4% and the health insurance, sick leave and vacation paid for the reviews shall take place at Budgetary approval meetings. Such salary shall be payable in equal monthly installments.

Approval of this contract by the BHA occurred when the BHA passed a resolution on January 3, 2002, that stated the following:

WHEREAS, at a meeting of the [BHA] the Board of Commissioners held January 3, 2002.

WHEREAS, [BHA] Budget for 2001-2002 is attached to this Resolution 2002-1. Along with the Addendum To Contract Of Employment.

NOW THEREFORE BE IT RESOLVED: that [BHA] is accepting the Budget, Addendum To Contract Of Employment for the remaining of the Fiscal Year 2001-2002 as attached to this Resolution 2002-1.

This resolution was signed by Kathy Prejean and three members of the BHA. Further, at the bottom of the resolution it states that a quorum was present. Accordingly, under La.R.S. 40:401, a legal resolution adopting the employment contract and its addendum was passed by the BHA.

The language of Prejean's employment contract is explicit. It expired in February of 2000; however, prior to that expiration, the addendum to the contract, cited above, was executed by the BHA and Prejean. Under the addendum's clear language, Prejean's employment was to continue until January 1, 2006. Further, the

18

addendum also has an extension period of four years that occurs unless the BHA would provide Prejean written notice of its intent not to extend the contract by October 1, 2005.

As such, Prejean's employment contract is valid and enforceable against the BHA until January 1, 2010. We found above that the BHA and the LHA were consolidated under La.R.S. 40:417. We also found that the LHA is a regional or consolidated housing authority under La.R.S. 40:384(23). Given the legislative mandate of La.R.S. 40:417(B) that "[a]ll rights and obligations of the [BHA] shall be the rights and obligations of the [LHA]," it follows that Prejean's contract can be "asserted and enforced . . . against the [LHA] as [it] might have been asserted and enforced by or against the [BHA]." *Id.*

Prejean claims that the LHA breached her contract by firing her in May of 2005. It is clear that Prejean carried her burden to prove that this was the case. She was fired prior to January 1, 2010, and the LHA does not dispute this fact. However, the LHA counters that, should we find that Prejean's contract is enforceable against it, as we have, Prejean breached the contract prior to her being fired, as her excessive absenteeism in early 2005 constituted "inadequate performance" under the terms of the contract.

The record reflects that the LHA passed a resolution to fire Prejean on May 17, 2005. Prejean was notified via letter of her firing that same day. It can be argued that the LHA gave Prejean written notice of its intent not to extend her contract prior to October 1, 2005, as the letter informing her that she had already been fired was dated May 17, 2005. However, under the language of the contract, the BHA/LHA, even if it gave Prejean notice of its intention to fire her, was barred from doing so unless the

19

firing was due to a finding of inadequate performance.

While Prejean's employment contract does give the LHA the right to fire Prejean for inadequate performance, what constitutes inadequate performance by Prejean is not defined. The only language in the addendum that can be read to define inadequate performance is as follows:

> The Board may make a finding of inadequate performance, after providing the Executive Director with written notice and an opportunity to be heard, upon a determination that a significant adverse audit finding (or adverse management review) by federal or state funding agencies has gone uncorrected for more than sixty (60) days due to action or inaction by the Executive Director.

"When the parties intend a contract of general scope but, to eliminate doubt, include a provision that describes a specific situation, interpretation must not restrict the scope of the contract to that situation alone." La.Civ.Code art. 2052. "Ambiguous language in a contract must be construed against the writer thereof." *Aptaker v. Centennial Ins. Co. of New York*, 198 So.2d 188, 189 (La.App. 1 Cir. 1967).

We cannot determine from the four corners of the language in the contract whether excessive absenteeism fits the definition of inadequate performance. Further, we cannot even determine from the language of the contract whether a finding by the board as stated in the language of the contract, i.e. an adverse audit, is the only form of inadequate performance that justifies Prejean's termination, or if this language is merely illustrative of adequate performance. Thus, what action or inaction by Prejean that the parties agreed would constitute inadequate performance is ambiguous.

Prejean testified that she wrote the contract with help from others not associated with the BHA or the LHA. Accordingly, as the writer of the contract, it must be interpreted against her. *Aptaker*, 198 So.2d 188. It follows then, that if the

record reflects that the LHA proved inadequate performance by Prejean in any form, then the LHA would be justified in firing her for her prior breach of the contract. We find that the LHA has failed to carry this burden.

The LHA's sole stated reason for firing Prejean is that she had excessive absences from work starting in February of 2005. However, the LHA put forth no evidence that Prejean did not have authorization to miss time from work, that Prejean actually did miss an excessive time from work, or that her work suffered so much as to be considered inadequate performance.

According to Prejean's medical file kept by the LHA's human resource department, Prejean had doctor's orders for her not to attend work from February 16, 2005, through July 25, 2005. This evidence is corroborated by the testimony of Mary Goody, the human resource director of the LHA until April 29, 2005. Goody testified that Prejean's file indicated that she was having a surgery on February 16, 2005, and was excused from work by her doctors until July 25, 2005. However, Goody also testified no person at the LHA had ever instructed her that Prejean had excessive absences from work.

Further, Guillory testified that neither he nor anyone at the LHA had ever inquired into whether Prejean had actually missed the days of work that the doctors' orders excused her from attending. Guillory assigned Tim Declouet to the BHA to serve as an observer for the LHA. According to Guillory, Declouet was assigned to the BHA office to be his "eyes and ears," but that Declouet had never told him that Prejean was missing work, underperforming at her work, or that Prejean was performing her work from her home, at times, rather that at the office.

It is clear from the record that Prejean did have medical authorization to miss

work from February 16, 2005, through July 25, 2005.  However, we find that the weight of the evidence is such that Prejean performed her job adequately, and with little actual absenteeism, until the date of her firing.

When specifically addressing her absenteeism, Prejean testified to the following:

Q      So what was going on with your health in January and February and until March [of 2005] till you had the next surgery?

A      I was still working, . . . doing my job.


Q      Were you doing your work mostly at home, mostly in the office? Give the Judge some idea of how that was going.

A      On my good days - - and I had pretty many good days because I'm a pusher - - I would go to the office, not for a full day, but I was there. Mr. Declouet would always tell me to go back home because he could tell the fatigueness [sic] that I was having. And I'd say, no, I was going to stay at work.


. . . .


And I would stay at work. I wasn't there for the full eight (8) hours some of the days, but I was there a majority of the time, along with working at home.


. . . .


Q      So then you had surgery in [February]?

A      Yes, sir.


Q      And how long were you out of work as a followup to that surgery?

A      Again, I was still working. I'd go home; I would take my medication, but I still had time that I would do my work.


. . . .


Q      In November [2004] and December, you were out of work due to surgery and medical conditions, correct?

A     Yes, sir.

Q     You weren't at work.

A     No sir. I was at work. I was at work. Two (2) weeks after my surgery in November, I was cutting checks for the [BHA]. And I was doing my recertifications. And I was doing the input into the computer. I may not have stayed the full eight (8) hours, but I was at the office.

. . . .

Q     So the doctor is saying, "Don't go to work. You're unable to return to work at this time because of surgical treatment."

A     That is correct.

Q     Are you saying that you're not following doctor's advice?

A     I did not for the simple reason I am dedicated to my work. And I had to keep something occupied to keep my mind from thinking of what I was going through.

. . . .

Q     [Y]ou were out from at least November 17th, 2004 up to January 9th, 2005. Did you return to work, as your doctor authorized, on January 10th?

A     I went to work prior to that date.

Q     [Y]ou had a surgery scheduled for February 16th of '05; is that accurate?

A     That is correct.

Q     And that you may return to work after eight (8) weeks. And [the doctor] lists April 18th, '05. Did you have surgery on February 16th of '05?

A     Yes, sir.

Q     Okay. And you were out of work for eight (8) weeks?

A     I was supposed to be out of work for eight (8) weeks, but I went back to work.

23

. . . .

Q      Toward the end of his examination, Mr. Stanford asked you about if one looked at the record of your excuses from the doctors, would one think that you had not been at work for a very long time. And you conceded that one would think that; is that correct?

A      That is correct.

Q      But those are the facts in this case?

A      No, it's not the facts in this case.

Q      And what are the facts in this case regarding your work record or you attendance at work of the components of your duties at home in the 2005 time frame, from January to the time that you received this letter from Mr. Webb?

A      I was always in contact with the staff members of the housing authority on a daily basis. The only time I was not in contact is when I was undergoing surgery or recouping the three (3) or four (4) days after surgery. But from that point forward, I was always in contact. They were either bringing the work home to me or I was going over there.

Q      Were there times in the 2005 time frame that these doctors' excuses would have suggested that you were not at work, that you actually saw Mr. Declouet from time to time?

A      Yes, I saw him frequently.

Q      And where would you see him?

A      At the office in Broussard.

Q      And would you all have any discussions of what was going on with the housing authority business?

A      He would just tell me everything was going smoothly, for me to continue doing my work that I was doing. And we had no problems.

Q      Mr. Declouet was a representative of the [LHA]; was he not?

A      Yes, he was.

Q      And he was assigned to the [BHA]?

A      From my understanding, yes, he was.

24

Q   And how frequently in that time frame of January to May, 2005 would you say that you saw Mr. Declouet in the office in Broussard and spoke with him?

A   Every time I went into the office. Approximately?

Q   Yes, ma'am.

A   Three (3) and half times a week for about - - you could say four (4) days out of the week.

The LHA did not submit any evidence that controverted this testimony by Prejean. The Mr. Declouet referenced in the above cited testimony is Tim Declouet. The LHA did not call Declouet to testify to potentially controvert Prejean's testimony, nor did it present any evidence that it performed any inquiry as to whether Prejean was following her doctors' orders by actually not attending to her work. Further, Prejean's testimony is corroborated by the testimony of Linda Anderson.

Linda Anderson was a case manager for the BHA, and, after the consolidation, a housing manager for the LHA, that supervised the Broussard and Abbeville office for the LHA. Anderson testified to the following:

Q   Did you remain familiar with Ms. Prejean when she got sick?

A   Yes.

Q   Do you remember what her illness was?

A   Yes.

Q   What was it?

A   She had breast cancer.

Q   And during the time that she was dealing with that, were you familiar with her attendance at work?

A   Yes.

Q   What was her attendance?

A   For what dates?

Q Well, not day to day, just in general, I'm asking you, please.

A She was still doing her executive director work.

Q In the days when she could not actually physically be present in the office, how did she manage to do her work?

A We would bring the paperwork to her house.

Given the above testimony, and the LHA's failure to controvert that testimony, this court cannot say that the LHA proved that Prejean was excessively absent from work.  Moreover, the evidence in the record is such that Prejean continued to perform her duties admirably until the date she was fired.  Prejean testified to the following regarding her work performance:

Q In the time between 1994, when you became the executive director and the time of May 19th of 2005, when you contract was terminated, what were your scores?

A A hundred (100)

Q Did you ever have any score that was less that a hundred (100)?

A No, sir.

Prejean's claim of excellent performance for the duration of her treatment for cancer is corroborated by the testimony of staff coworkers.  Regarding the February 2005 surgery, Anderson testified as follows

Q Was there ever any work that Ms. Prejean was assigned to do as executive director of the [BHA] when she was ill, that she did not do?

A No.

. . . .

Q Was there ever any incident that arose in that time frame from January of '05 until Kathy was terminated in late April or May of '05, where you observed that she was not doing her work?

A No.

26

. . . .

Q    Specifically, ma'am, what were some of the duties that the executive director - - in this case, Kathy Prejean - - would have to do that the rest of the folks in the office could not do?

A    We did not pay landlords. We did not input information into the system; she did that. I know from her saying that she did the budget. I don't know what all an executive director does.

Q    Could you write checks?

A    No.

Q    Could you file monthly reports?

A    No.

Q    Could you supervise employees in the office?

A    No.

Q    Could you hire?

A    No.

Q    Could you fire?

A    No.

Q    Whose duties were those?

A    It was Ms. Kathy's.

On cross examination, Anderson did testify that she was not privy to all of Prejean's duties. Further, Anderson stated that because she was not sure of each and every one of Prejean's duties, she was not in a position to know if Prejean was performing all of her duties on a regular basis. In summation, Anderson testified that, despite not knowing every duty of Prejean, to her knowledge, Prejean had performed all her duties adequately up until the time Prejean was fired.

The testimony of Prejean and Anderson is consistent with what the record

27

shows was that Prejean had a history of excellent work habits. Lana Davidson, a retired school teacher, was a resident commissioner of the BHA. As a resident commissioner, Davidson stated that she was a member of the BHA board until October 2004 and that she knew Prejean since 2002. She testified as follows:

Q      In the time that Ms. Kathy was the executive director of the housing authority and you were a commissioner, did you have an opportunity to observe her work as the executive director?

A      Oh, yes.

Q      And can you tell [the trial court] a little bit about the manner in which [Prejean] conducted her work?

A      Very professional. Very fair.

Q      Did you watch her perform her duties as a commissioner, while you were commissioner?

A      Oh, yes.

Q      Do you know of any reason, during the term - - during your term as commissioner that would have justified Kathy Prejean's termination as executive director?

A      No.

. . . .

Q      And how often did you have an occasion - - say, during the course of one year - - any year - - would you have an occasion to observe Ms. Prejean?

A      During the meetings and when she would [] present all the things that had been happening. And she was very, very accurate and [] also, very professional about writing things and making documents.

It is true that Davidson was not a member of the BHA after October of 2004. However, her testimony establishes that, in Davidson's opinion, Prejean's work tended to be excellent, and certainly was not inadequate.

Casandra Dupre, a former coworker of Prejean's, worked with the BHA from

28

February 2002 to November 2004. Dupre first worked as a secretary, then as a housing specialist. Dupre testified to the following regarding Prejean's work:

Q    In the time that you worked for the [BHA], did you ever have anyone come to you and actually complain about the way Kathy Prejean was doing her work?

A    No.

Q    What was your observation as to how she did her work?

A    She was efficient, worked - - done [sic] a really good job.

Q    Was there ever a time, Ms. Dupre, that you had to do work that was Ms. Prejean's job?

A    No, she's kind of a workaholic so she does all he work.

Wyvonne Brupbacher was another former coworker of Prejean's that testified. Brupbacher started out doing day-to-day operations for the BHA, and eventually became the office manager of the BHA. Finally, after a work injury caused her to miss time from October of 2004, Brupbacher worked for the LHA on hurricane vouchers and applications following Hurricane Katrina. She testified to the following:

Q    What was your familiarity, Ms. Brupbacher[,]with the auditing process of the housing authority insofar as the BHA was concerned? How often were you audited?

A    Once a year.

Q    Okay. And you were there for about four (4) or five (5) years?

A    Yes, sir.

Q    During that time, did you ever learn of any auditing irregularity at the BHA?

A    No, sir.

Q    Was any irregularity ever called to your attention?

A    No, Sir.

29

. . . .

Q      Do you recall what the occupancy was at the BHA of tenants to available units?

A      We were a hundred (100%) occupied.

Q      And that means that every unit that you had had a tenant in it?

A      Every voucher that we were to be working was working.

Q      And how many folks did you have in pubic housing in the BHA?

A      Vermilion [sic] had three hundred sixteen (316). And Broussard had three hundred twenty-four (324), I believe.

Q      So if we add those two (2) together, that would give us the total of what you had?

A      About six hundred thirty (630) somewhat.

Q      Do you know what HUD calls a troubled agency?

A      Yes, sir.

Q      What is a troubled agency?

A      A troubled agency is an agency that doesn't have all their vouchers in working order. They're in trouble because they're not putting their funding out to the tenants to have housing.

Q      Was the [BHA] a troubled agency?

A      No, sir.

Q      What did you observe [] about Ms. Prejean in the time that you worked there in terms of her following the rules and regulations of the housing authority?

A      We had to follow all of the rules and regulations. If they changed tomorrow, we had to adapt to the new changes.

Q      Was [Prejean] strict about that?

A      Oh, very.

Brupbacher, like Davidson, was not an employee of either the BHA or the LHA

during the time that Prejean was terminated. However, her testimony does indicate that Prejean, when she had undergone a prior surgery, still had an exemplary work history, rather than a tendency to perform inadequately.

As such, given the weight of the evidence, we find the LHA has failed to carry its burden to prove that Prejean breached her employment contract prior to her being fired. Therefore, we find that Prejean is entitled to recover under the terms of her employment contract from the LHA until January 1, 2010.

Prejean requests that should this court make a finding that she is entitled to recover under the terms of her contract from the LHA, we remand the case for further proceedings so that she can put forth evidence of what she is entitled to recover. We deny this request.

Our Supreme Court, in *Herbert v. Travelers Indemnity Co.*, 255 La. 645, 232 So.2d 463, 464 (La.1970), stated, "[t]he law favors a prompt disposition of cases for the benefit of litigants who have had their day in the trial court. Protracting the litigation to receive evidence that should have been obtained for the original trial is to be avoided." *See also Love v. AAA Temporaries, Inc.*, 03-1460 (La.10/17/03), 858 So.2d 410

In the case before us, Prejean makes no assertion that any relevant evidence was unobtainable with due diligence. Given that she has already been afforded the opportunity to submit any relevant evidence for her recovery under the terms of her employment contract and its addendum, we deny Prejean's request for remand.

Louisiana Code of Civil Procedure article 2164 states, in pertinent part, "[t]he appellate court shall render any judgment which is just, legal and proper upon the record on appeal." Our supreme court, in *Gonzales v. Xerox Corp.*, 254 La. 182, 320

So.2d 163, 165-66 (La.1975) (citations and footnote omitted) stated:

> While the trial court remains the original forum for resolving factual and legal issues, the Louisiana Constitution expressly extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law.

> . . . .

> In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.

A full trial was conducted by the trial court, complete with exhibits, testimony, and witnesses presented by both Prejean and the LHA. Thus, we find that the record before us is complete. Accordingly, we will look to the record to determine what, if anything, Prejean proved at trial that she is entitled to recover under the terms of the employment contract from the LHA.

Louisiana Civil Code Article 2749 states:

> If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived.

The language of the addendum to her employment contract pertaining to what Prejean is entitled to receive in exchange for her labor is as follows:

> The [BHA] shall pay the Executive Director an [sic] monthly salary of $7000.00 and a car allowance of $500.00. Determined by the Authority Board, consistent with U.S. Department of Housing and Urban Development and [BHA] guidelines. Annual salary with a cost of living

32

of <u>4%</u> and the health insurance, sick leave and vacation paid for the reviews shall take place at Budgetary approval meetings. Such salary shall be payable in equal monthly installments.

The language of the contract is explicit. Prejean is to receive $7,000.00 per month and a car allowance of $500.00 per month beginning in January 2002 with an annual cost of living adjustment of four percent thereafter. The contract can be interpreted two ways as to whether the annual cost of living adjustment applies to Prejean's monthly salary only, or to both her monthly salary and her car allowance. As we found above, given that Prejean wrote the contract, this ambiguity must be construed against her. Thus, we make an initial finding that the cost of living adjustment applies solely to her monthly salary.

Prejean was fired and paid her salary in May of 2005. Therefore, for 2005, we find that she is entitled to seven months of salary for the months of June through December. Further, as per La.Civ.Code art. 2749, we find that for the years 2006 through 2009 Prejean is entitled to the total amount of her monthly salary, with the four percent annual cost of living adjustment for each year, plus interest from the date of judicial demand.

The contract also calls for Prejean to receive $500.00 in a monthly car allowance. We are unable to determine whether this allowance was given to her by the BHA with the intention of compensation or with the intention of it being a sum of money allotted or granted to Prejean for her automobile expenses.

As above, given that Prejean drafted the addendum, we will interpret this item against her and deny her request for the car allowance. We find this result just, as allowances such as these are generally to reimburse an employee for expenses. Here, because Prejean was fired, she did not incur the expenses that the car allowance was

33

likely designed to alleviate. Further, it was Prejean's burden to prove that she was entitled to the car allowance should it have been compensatory in nature, and we find no evidence in the record that she has done so.

Finally, Prejean claims to be entitled to the value of her health insurance benefits provided for in the contract. The contract is silent as to the value of this benefit. After reviewing the record, we find no evidence of what the value of Prejean's health insurance benefits entails. Therefore, we can only conclude that Prejean has failed to carry her burden of proof necessary to recover for the value of this item.

**CONCLUSION:**

We find that the trial court committed an error of law in failing to consider La.R.S. 40:417 in rendering its judgment, as it does apply to the LHA as a regional or consolidated housing authority per La.R.S. 40:384(23). Therefore, after a *de novo* review of the record, we find that Prejean had a valid and legal employment contract, as edited and extended by its addendum, with the BHA.

We also find that by operation of La.R.S. 40:417(B), the LHA is responsible for honoring the BHA's contract with Prejean. We find that Prejean carried her burden to prove that the LHA breached that contract by firing her, and that the LHA failed to carried its burden to prove that Prejean had breached the contract prior to her firing by performing her job inadequately due to excessive absenteeism or otherwise.

We deny Prejean's request to a remand of her case in order for her to prove further damages due her from the LHA's breach of her contract. We find that the record before us is complete and that, under the clear terms of the contract, Prejean is entitled to a judgment awarding her seven months of salary for the months of June

34

through December for the year 2005, plus interest from the date of judicial demand. Further, as per La.Civ.Code art. 2749, we find that for the years 2006 through 2009 Prejean is entitled to the total amount of her monthly salary, with the four percent annual cost of living increase for each year, plus interest from the date of judicial demand. Finally, we find that Prejean failed to carry her burden to prove that she is entitled to recovery for her car allowance or her health insurance benefits.

**REVERSED AND RENDERED.**