GRAVOIS, Judge.
^Plaintiff, BellSouth Telecommunications, Inc., d/b/a AT & T Louisiana (“AT & T”), filed a suit for damages against defendant, Bennett Motor Express, LLC (“Bennett”), contending that Bennett was liable for damaging two AT & T overhead fiber optic cables after one of Bennett’s vehicles hauling an oversized load pulled down the cables near Edgard, Louisiana.[1] Following a one-day bench trial, the trial court ruled in favor of Bennett, finding no negli *239 gence on the part of Bennett, and finding further that the actions of Bennett were not a cause-in-fact of the accident. AT & T now appeals that judgment.
On appeal, AT & T first argues that the trial court committed reversible error by misinterpreting and not applying the plain language of La. R.S. 32:381 to the facts of this case, and in ruling that proof of negligence is required before the |soperator of an oversized load may be liable to a utility company for damages to aerial cables caused by the oversized load coming into contact with the cables. Second, AT & T argues that the trial court erred in finding that the actions of the operator of the oversized load were not a cause-in-fact of the accident.
For the following reasons, we reverse the judgment of the trial court and render judgment in favor of AT & T.

FACTS

The accident in question occurred on December 23, 2006 on Louisiana State Highway 18 (commonly known as the River Road) near Edgard, in St. John the Baptist Parish, Louisiana, around 2:20 p.m. on a clear and sunny day. William C. Sanders, the owner/driver of a tractor/trailer truck, was employed by Bennett as a driver and was in the process of moving a large transformer from a facility in Crystal Springs, Mississippi, across Louisiana to its ultimate destination in California. Mr. Sanders[2] described the transformer as being a large metal box, flat on the top, with three porcelain insulators sticking 18 inches out of the top of the box near the left side (facing forward). The top of the insulators were the highest part of Mr. Sanders’ load, which he had carefully measured at 16 feet 6 inches from the ground after the transformer had been loaded onto his trailer the previous day.
Because Mr. Sanders’ load exceeded the maximum permitted height allowed under La. R.S. 32:381, Bennett had secured the necessary oversized load permit from the Louisiana Department of Transportation and Development (“DOTD”), pursuant to La. R.S. 32:387, which permit noted the measured height of the load (16 feet 6 inches, as measured by Mr. Sanders) and designated the route through |4Louisiana that Mr. Sanders would travel with his load.[3] Mr. Sanders testified that he had transported height-oversized loads along this same route numerous times prior to the date in question, and had in fact moved an identical transformer along this same route only weeks prior to the subject accident, under the same cables, without incident. Mr. Sanders explained that the permit required him to use a highway escort service, which consisted of a “pole truck” that drove in front of his load with a height pole that measured 17 feet high (ie., six inches higher than the highest point of the load). The pole truck’s purpose was to ensure that the load would clear all overhead structures along the designated route. A back escort followed behind Mr. Sanders’ rig. Additionally, the entourage was escorted through Louisiana by a Louisiana state trooper traveling ahead in a marked state trooper vehicle. All of the drivers were in constant communication with each other via CB radio.
On the day in question, Mr. Sanders had been driving for around 5-7 hours. He stated that he had gotten between 8-10 hours of sleep the night before, was alone *240 in his truck, and was not on any medication, drugs, or alcohol. He did not know the speed limit of the highway at the site of the accident, but knew that he was not speeding at that time because he was being escorted by a state trooper. He estimated that his speed at the time of the accident was around 30 miles per hour. He had measured the pole on the pole truck that morning and confirmed that it was 17 feet high.
Mr. Sanders testified that his view of the cables in question was obscured by low hanging tree branches, and that he never saw the cables. He described the highway at the point in question, which was located along side of the Mississippi River levee, as “skinny” (meaning that it had one lane of travel in each direction). |sHe could recall no problems with the road surface. He testified that the driver of the pole truck, who was about 300 yards ahead of him, had radioed to warn him of the low hanging tree branches and to advise him to move to the center of the highway in order to avoid them. He stated that he moved over as far to the left of his travel lane as he could, but could not go to the center of the highway because of oncoming traffic. He testified several times that he was not able to move “much” to the middle of the highway because of oncoming traffic. He said that he was paying attention to the traffic and the tree branches and did not see the cables in the branches. He explained that his load’s right front corner, which was 15 feet high, made contact with the branches as he went through them at about 30 miles per hour. He stated that the high point of his load (the insulators) did not come into contact with the tree branches or the cables. Mr. Sanders said that he did not know how high the tree branches were, but that he was “in it” (the tree), as some of the branches were pretty low and were hitting his load as he went underneath them. He did not feel his truck hit the cables and he did not know that he had damaged the cables until his back escort vehicle, which was about 60 feet behind him, radioed for him to stop because he had a cable hanging on the right front corner of his load. He did not know if the branches may have snagged up in the cables. He reiterated that he was not able to go to the center of the roadway as his pole truck driver had advised him to do because of oncoming traffic.
Mr. Sanders testified that he had worked with this particular escort company many times before and believed that they were very competent in their work. He said that his pole truck driver would always tell him if she hit or cleared an aerial obstruction. He explained that his pole truck driver was able to see the top of her pole via a mirror that was mounted to her dashboard. It was her practice to tell him to go around tree branches, not under them, which is exactly what she did on this | ^particular occasion. He testified that his pole truck driver told him that she hit a few of the branches on her way through. He did not know if she saw the cables in the branches because he never asked her specifically if she did.
Mr. Sanders admitted that he could have stopped his truck and asked his state trooper escort to stop oncoming traffic so that he could go around without hitting the branches. He testified that he had, in fact, done that before on other trips. He didn’t do so this particular time because he didn’t know there was a line there that he would tear down. Mr. Sanders testified that he inspected his load after the accident and there was no damage to the load; the insulators, which were the highest point of the load and were fragile, did not snag anything and were not damaged. One of the cables was hanging on the right front corner of his load, which he de *241 scribed as a “square” corner with no hooks.
Mr. Sanders explained that as the driver, it was his responsibility to measure the height of his load. He said that he had measured this load several times in multiple places, and was confident of his measurements. He furnished these measurements to Bennett who secured the oversized load permit from DOTD. Mr. Sanders did not know if there was a legal requirement that the pole height on the escort truck be set six inches higher than the load’s measurement, but that is what he always did. He admitted to two past incidents in other states where his pole truck cleared an overhead obstruction but his load did not. He agreed that the pole truck tries to drive under the lowest part of an overhead obstruction. He did not' remember if the road at the site of the accident leaned at all or if it was flat. He said that there were no bumps in the road at the point in question that could have made his load bounce higher.
On his previous trip, only weeks earlier, both his rig and his pole truck escort, with the pole height at 17 feet (the same as in this trip), cleared the same |7location. On that earlier trip, he presumed that he had traveled down the center of the highway at this location as his pole truck driver had directed, and did not make contact with the tree branches or the cables. He agreed that the branches were not new and that he had probably gone around the same branches on the previous trip. When asked why he didn’t hit the cables the first time, he stated that as best he could recall, there was no oncoming traffic on that first trip and he was able to go around the branches on that trip.
Mr. Sanders acknowledged that in an affidavit executed in connection with this case he said that the cables were hanging lower than 16 feet 6 inches; in his testimony, however, he clarified that he never saw the cables and could not say how high they were.
At trial, Robert Gentry, AT & T’s outside plant technician, testified that he was in charge of the temporary repair of the damaged cables after the accident. He noted that the fiber optic cables were torn down between pole numbers 116 and 117. He testified that the fiber optic cables are very light, being made of very fine glass, and that when strung between two poles, have very little “sag” because of their light weight. He said that after the accident, temporary cables were strung between the same poles and from the same points of contact on the poles, which were located from between 24 and 25 feet above the ground. On cross-examination, he agreed that he had no information regarding what the lowest point of the cables was immediately prior to the accident.
Michelle Nero, AT & T’s manager of outside plant planning and design, testified that the first of these particular cables (a 36-count fiber optic cable) had been installed at this location in 1996. She was not able to find the job drawing for the installation of this cable. The second cable at this crossing (a 144-count fiber optic cable) was installed in April, 2006, only a few months prior to the subject |8accident. She identified the drawing that represented placement of the second cable in 2006. This drawing showed that the minimum height of the cables’ sag when installed at the midway point between the pertinent poles was 19 feet 3 inches. She described the individual fiber optic strands as very thin glass wire, almost like a piano string, that can be pulled very taut. She stated that at this particular location, the cables spanned 312 feet between the poles; they carry no voltage. She testified that she had been to the site herself and observed that the midpoint between the pertinent *242 poles is the center of the highway. On cross-examination, she stated that sometime after the second cable was installed, the height of the line was measured to confirm that it was installed at the correct height as designed.
Ms. Nero stated that shortly after the accident, temporary repairs were made to the cables. Permanent repairs were done a few months after the accident, when the temporary cables were replaced. At that time, the permanent cables were measured at about 19.5 feet above the ground. She was not aware of any prior complaints regarding the height of these cables or at this location. She had no reason to believe that on the day of the accident, these cables were lower than 19 feet 3 inches above the roadway at the time of the accident. She clarified that the measurements are made from the surface of the roadway up to the point of the lowest sag on the cables.
Dale Spikes, a senior risk specialist with AT & T, testified that his job included investigating damage to cables and calculating the costs of the damages and repairs. He identified invoices generated by AT & T for the cost of repair to these cables.

laSTANDARD OF REVIEW

It is well settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1979). In Arceneaux, the Supreme Court set forth a two-part test for appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court; and (2)the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. Arceneaux, 365 So.2d at 1333. If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993); Sistler, 558 So.2d at 1112.
Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

FIRST ASSIGNMENT OF ERROR— statutory interpretation

In its first assignment of error, AT & T argues that the trial court committed reversible error by misinterpreting and not applying the plain language of La. R.S. 32:381 and in finding that it requires proof of negligence before the operator of an oversized load may be liable to a utility company for damages to an aerial cable.
In Burnette v. Stalder, 00-2167 (La.6/29/01), 789 So.2d 573, 577, the Supreme Court reiterated the principles of statutory construction and interpretation:
| ^Legislation is the solemn expression of legislative will and, therefore, the interpretation of legislation is primarily the search for the legislative intent. (Citations omitted.) When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written and no further interpretation may be made in *243 search of legislative intent. La. Civ. Code art. 9. (Citations omitted.) However, if a statute is ambiguous or susceptible of more than one reasonable interpretation, statutory construction is necessary. (Citations omitted.)
The function of statutory interpretation and the construction to be given legislative acts rests with the judicial branch of government. (Citations omitted.) When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. Civ.Code art. 10. (Citations omitted.) Louisiana Rev. Stat. § 1:3 also provides that, when interpreting the revised statutes, courts shall read and construe statutory words and phrases in their context and in accordance with the common and approved usage of the language. See also La. Code Civ. Proc. art. 5053 (same).
Accordingly, the starting point for the interpretation of any statute is the language of the statute itself, while being mindful that the paramount consideration for statutory interpretation is always the ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law. (Citations omitted.) Therefore, when the apparent meaning of the statute appears doubtful or the language can reasonably be interpreted in more than one manner, courts must search deeper to discover the legislative intent. (Citations omitted.)
Louisiana Revised Statute 32:381, found in the Louisiana Highway Regulatory Act, provides:
(A)(1) The height of any vehicle and its load shall not exceed thirteen feet, six inches, except that the height of any vehicle and its load which operates exclusively on the interstate highway system shall not exceed fourteen feet, provided that vehicles operating on the interstate highway system shall have reasonable access, within one road mile from the interstate highway to terminals and facilities for food, fuel, repairs, and rest, unless prohibited for specific safety reasons on individual routes.
(2) The operator of a vehicle that is higher than thirteen feet six inches shall ensure that the vehicle will pass through each vertical clearance of a structure in its path without touching the structure.
| n(3) Any damage to a bridge, underpass, or similar structure caused by the height of a vehicle shall be the responsibility of the owner of the vehicle.
(B) Nothing in this Section shall be interpreted to require the state or any subdivision thereof or any person, firm, or corporation in this state to raise, alter, construct, or reconstruct any overpass, wire, pole, trestle, or other structure to provide such clearance.
The trial court, in its reasons for judgment, fails to mention or apply La. R.S. 32:381, but instead finds that Mr. Sanders’ actions were not the legal cause of AT & T’s damages. Upon de novo review, for the following reasons, we find that such determination by the trial court was legal error.
The Louisiana Highway Regulatory Act, La. R.S. Title 32, provides uniform traffic regulations that “govern the operation of vehicles and pedestrians upon all highways within this state and other areas specifically set forth.” La. R.S. 32:21. La. R.S. 32:381 governs the legal responsibilities and duties of operators of oversized vehicles. It specifically applies in this case *244 because Mr. Sanders’ load height was un-disputedly over 13 feet 6 inches. As such, it is apparent that the trial court committed legal error by failing to apply this statute, considering the particular facts and circumstances of this case.
This statute specifically charges the operator of an oversized vehicle with the affirmative duty, by use of the word “shall,” to ensure that his load will pass through each vertical clearance of a structure in its path without touching the structure. La. R.S. 32:381(A)(2). In the next paragraph, the legislature clearly states that “[a]ny damage to a bridge, underpass, or similar structure caused by the height of a vehicle shall be the responsibility of the owner of the vehicle.” La. R.S. 32:381(A)(3). (Emphasis added.) These two provisions are made without qualification or exception. Accordingly, we find that Mr. Sanders had a legal duty |12to conform his conduct to this statutory standard, and that the facts of this case as noted above show that he failed to do so.

SECOND ASSIGNMENT OF ERROR— cause-in-fact of the accident

Upon de novo review, as set forth below, we find that the trial court’s finding of fact that the actions of the driver, Mr. Sanders, were not the cause-in-fact of AT & T’s damaged cables, is likewise manifestly erroneous.
The violation of a statute or regulation does not automatically, in and of itself, impose civil liability, as Louisiana has no negligence per se doctrine. Civil responsibility is imposed only if the act in violation of the statute is the legal cause of damage to another. Faucheaux v. Terrebonne Consol. Gov’t, 615 So.2d 289, 292-93 (La.1993); Bellsouth Telecommunications, Inc. v. Eustis Eng’g Co., Inc., 07-0865 (La.App. 4 Cir. 12/19/07), 974 So.2d 749, 750. Accordingly, we must conduct a duty — risk analysis. Though the court in Eustis considered a statutory violation, similar to the issue before us in the instant case, it nevertheless conducted a duty— risk analysis utilizing the same duty — risk analysis employed in negligence cases:
In Roberts v. Benoit, 605 So.2d 1032 (La.1991), the Louisiana Supreme Court held that in order to prevail on a negligence claim under La. C.C. articles 2315 and 2316 a plaintiff must prove 5 separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element.) To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant’s conduct, the incident probably would not have occurred. The critical test in Louisiana is phrased in terms of the “ease of association” which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant? The essence of the legal cause inquiry is whether |1sthe risk and harm encountered by the plaintiff fall within the scope of protection of the duty.
The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks *245 whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner_ In determining the limitation to be placed on liability for defendant’s substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 293-294 (La.1993).
Bellsouth Telecommunications, Inc. v. Eustis Eng’g Co., Inc., supra, at 751-752, quoting from South Cent., Bell Tel. Co. v. Sewerage and Water Board of New Orleans, 94-1648 (La.App. 4 Cir. 3/16/95), 652 So.2d 1090, at 1093-1094.
Applying this standard to AT & T’s claims, it is clear that La. R.S. 32:381 imposes a duty on the operators of oversized loads to ensure that the oversized vehicle will pass through each vertical clearance of a structure in its path without touching the structure, and that the risk of damage to the overhead cables is clearly associated with the operator’s negligent act of failing to ensure that passage. Here, Mr. Sanders failed to conform his conduct to the required standard: he failed to ensure that his load could safely pass under the obstruction. His substandard conduct was accordingly a cause-in-fact of AT & T’s damages.
By his own testimony, Mr. Sanders admitted that he did not follow the instructions of his pole truck driver to move to the center of the roadway in order to clear the tree branches. His pole truck, with a pole height of 6 inches higher than the load height, passed under the cables without contact. Because Mr. Sanders did not move fully to the center of the roadway, his load snagged the branches, which in turn apparently snagged the cables, tearing them down. Mr. Sanders freely acknowledged that he could have asked his state trooper escort to |14stop oncoming traffic so that he could follow the instructions of his pole truck driver to move to the center of the highway, but decided not to do so. He also acknowledged that he had cleared the same cables only weeks before with an identical load of identical height, because on that earlier trip, he apparently was not faced with oncoming traffic and was able to drive down the center of the roadway.
Mr. Sanders’ conduct was also a legal cause of AT & T’s damages. La. R.S. 32:381 was enacted to regulate the height of vehicles traveling on state highways and in particular to protect overhead structures such as bridges and wires from contact with oversized vehicles. AT & T’s cables were damaged by the very act that La. R.S. 32:381 was enacted to prevent. The scope of protection element is clearly met here.
Lastly, AT & T proved that it suffered real damages. Its witness testified regarding his knowledge of the repair of the line. As noted above, Mr. Spikes, a senior risk specialist with AT & T, testified that his job included investigating damages to cables and calculating the costs of the damages and repairs. He identified invoices generated by AT & T for the cost of repair to these cables.
The trial court found as a matter of fact that AT & T’s cables were “necessarily hanging at or below 16 feet 6 inches.” Upon de novo review, we find that this factual finding is likewise manifestly erroneous. The record is devoid of any such evidence. The pole truck, with the pole height of 17 feet, cleared through under the cables without contacting them. Considering the record reviewed in its entirety, it is obvious that at the time of the accident, the cables in question hung at a height of more than 17 feet; otherwise, the *246 pole truck would not have cleared them. AT & T’s representative, Ms. Nero, as noted above, testified that the cables hung at a height of at least 19 feet 3 inches when installed only months before the accident. Mr. Sanders testified that while he could see the branches, he could not | )Bsee the cables. Based on the testimony and evidence introduced, what appears to have actually happened in this case is that Mr. Sanders, unable to move all the way to the center of the roadway because of oncoming traffic, drove through the low hanging branches, making more contact with them than his pole truck did, which branches in turn came into contact with the cables, causing them to become snagged on the right front corner of Mr. Sanders’ load and break.
The trial court also cited to a regulation in the Louisiana Administrative Code as a basis for placing fault on AT & T and exculpating Bennett. That regulation, La. Admin. Code. tit. 70, pt. II § 515(C)(2)(a), states:
(a) The minimum vertical clearance for overhead power and communication lines above the highway and the lateral and vertical clearances from bridges shall conform with the National Electrical Safety Code. However, in no instance should an aerial crossing have less vertical clearance over the roadway surface than 20 feet. A minimum vertical clearance of 16 feet shall be maintained between existing ground elevation and any aerial installation when such installation is within highway right-of-way, but does not cross the traveled surface of a highway.
(Emphasis added.)
Irrespective of this regulation, the evidence in this case is clear that the height of AT & T’s cables, whatever they may have actually been, was not a cause-in-fact of this accident. This is because the pole truck, at a height of 17 feet, cleared the cables, and that the highest point of the load was only 16 feet 6 inches. There is no direct evidence in the record of the cables’ exact height, except the testimony of Ms. Nero, AT & T’s witness, who stated that the cables were designed and built at a height no lower than 19 feet 3 inches only months prior to the accident. Accordingly, upon our de novo review, we find the fact that the cables may have had a ground clearance of slightly less than the cited Administrative Code’s minimum height requirement of not less than 20 feet (and as such, even if technically in violation of the cited Administrative Code’s minimum height | ^requirement) was not a cause-in-fact of the subject accident; rather, it was Mr. Sanders’ failure to follow his pole truck driver’s instructions to move to the center of the highway on a clear path around the branches that was the sole cause-in-fact of this accident.

DAMAGES

AT & T prays that this Court remand the matter to the trial court for calculation of damages. However, we find that a remand is unnecessary. At trial, AT & T presented evidence of its damages through the introduction of invoices evidencing the costs to repair the fiber optic cables through the testimony of its witness Dale Spikes. When the record is complete, the court of appeal is empowered, under La. C.C.P. art. 2164, to award damages in cases having the procedural posture this case has.[4]
At trial, Mr. Spikes testified regarding the invoice he submitted as proof of AT & *247 T’s damages, which totaled $33,474.52. His unrefuted testimony was that AT & T incurred $18,052.12 in expenses to repair the subject cables. Mr. Spikes was unable, however, to provide personal knowledge in support for the portion of the invoice noting “Loss of Use” in the amount of $15,422.40. He testified that this figure had been furnished to him by someone else at AT & T and that he could not supply any more information or documentation relating to this element of damages. Accordingly, based on the evidence of damages submitted by AT & T at trial, we find that AT & T is entitled to an award of $18,052.12 in damages.

\ ^CONCLUSION

For the reasons stated herein, based on our de novo review of the entire record of this matter, we reverse the judgment of the trial court, finding that the trial court committed legal error in failing to apply the provisions of La. R.S. 32:381 to the particular relevant facts of this case. We also find that the evidence in this case clearly shows that Bennett’s driver, Mr. Sanders, violated the provisions of La. R.S. 32:381, and that such violation was a cause-in-fact and the sole legal cause of the accident that caused damages to AT & T’s cables. Further, based on the record before us, we hereby render judgment in favor of AT & T and against Bennett in the amount of $18,052.12. All costs of this appeal are assessed to Bennett.

REVERSED AND RENDERED.

. The record reflects that two AT & T fiber optic cables were damaged in the accident. The cables were, however, wrapped together as one cable at the point in question where they crossed over the roadway. For consistency and accuracy, we will refer to the cables that were damaged in this accident in the plural throughout this opinion, although in reality they were wrapped together as one cable at the point in question.

. Mr. Sanders’ deposition testimony was accepted into evidence at trial in lieu of his live testimony.

. It has not been claimed that Mr. Sanders’ vehicle was improperly permitted or that it deviated from its assigned route.

. See also Prejean v. Guillory, 09-495 (La.App. 3 Cir. 1/13/10), 28 So.3d 1174 rev'd in part on other grounds, 10-0740 (La.7/2/10), 38 So.3d 274. In that case, after reversing the *247 trial court and finding in favor of plaintiff in her breach of contract case, the court of appeal declined to remand to the trial court for assessment of damages, finding that plaintiff had already been afforded the opportunity in the original trial to submit any relevant evidence of damages. The court found that "protracting the litigation to receive evidence that should have been obtained for the original trial is to be avoided.” Accordingly, the court of appeal rendered judgment on the record before it.