MARC E. JOHNSON, Judge.
| PThe issue in this inverse condemnation case concerns the amount of compensation due landowners as a result of the taking of their land by the New Orleans Aviation Board. In this appeal, PlaintiffsAandown-ers challenge the trial court’s judgment finding the amount of just compensation owed by Defendant, New Orleans Aviation Board, for taking the subject property to be $30,740.00. For the reasons that follow, we amend the judgment and affirm as amended.

FACTS & PROCEDURAL HISTORY

In January 2011, Plaintiffs/landowners, St. Charles Land Company, II, L.L.C.; J. Edgar Monroe Foundation; Burgess St. Charles Land, L.L.C.; Michael W. Burgess, as Trustee for George Burgess Jr., Trust # 3 and George Burgess, Jr., Trust # 4; and Burgess Properties, L.L.C. (collectively “Landowners”), filed a petition against Defendant, City of New Orleans by and through the New Orleans Aviation Board (hereinafter referred to as “NOAB”), seeking compensation for NOAB’s alleged taking of immovable property without proper expropriation ^proceedings or payment of just compensation. The Landowners alleged that in 1956, NOAB leased approximately 200 acres of land from them or their predeees-sors-in-interest. According to the petition, the lease had a term of 22 years, but NOAB purchased a significant portion of the leased land in 1962 prior to the expiration of the lease.[1] The Landowners al *132 leged that NOAB has continued to occupy, from April 2, 1987 through the present, eight acres of land, which were not included in the 1962 Act of Sale and which were owned by the Landowners or their predecessors-in-interest, without payment of just compensation. The Landowners asserted that in April 1987, NOAB began constructing an extension of an airport runway over the eight acres of land, and that NOAB continues to utilize the expanded runway to date. In their petition, the Landowners sought just compensation to the full extent of their loss for the taken property and attorney’s fees.
The parties entered into many stipulations prior to trial. In their stipulations, the parties agreed that (1) the property at issue consisted of 8.08 acres; (2) all parties believed in good faith that NOAB owned the 8.08 acres from the 1962 Act of Sale until March 1, 2010, when the Landowners discovered that the land had actually been appropriated; (3) NOAB was liable and obligated to pay just compensation for its April 2, 1987 appropriation of the 8.08 acres; (4) the only issue for trial was the amount of just compensation due to the Landowners, including interest, attorney’s fees, expert fees and costs;[2] and (5) the applicable date for valuation of the property was March 1, 2010.
|4The matter proceeded to a bench trial on March 5, 2013, with the only witnesses being real estate appraisal experts and a wetlands permitting expert.
The Landowners called two real estate appraisers, Mr. Heyward Cantrell and Dr. Wade Ragas, to testify in their case-in-chief. Mr. Cantrell explained that the first step in the appraisal process is to determine the highest and best use, or most profitable use, of the property. In determining such use, an appraiser must consider what is legally permissible, what is physically possible, and what is financially feasible. •
Mr. Cantrell explained that the subject property was a relatively thin parcel of land, being 159 feet wide and over 2,200 feet long. He concluded that the highest and best use of the 8.08 acres was airport-related uses. In reaching his conclusion, Mr. Cantrell considered the fact the land was leased by NOAB in 1956, for a term of 22 years, with an agreement that the property was only to be used for approach ways, runways, and related airport facilities. He explained that the use of the land was restricted by the lease until 1962, when NOAB acquired the property and continued to use it as an approach until incorporating the land into its east-west runway expansion project in the 1980s. Mr. Cantrell further considered the property to be a part of a transportation corridor. He testified that he did not value the property as part of the airport, but rather valued the property as a key parcel needed for complete assemblage of the airport complex.
Mr. Cantrell explained that he based the value of the 8.08 acres by considering neighborhood property and the land’s proximity to the airport. He relied on four comparable property sales and added a premium of 30% for plottage value, which is applicable when property is assembled with an adjacent piece of property thereby adding more value to the appraised property. He further deducted the costs of clearing, demucking, and fill *133 ing the land that had been done by NOAB | s after it appropriated the land, which was approximately $847,831. Mr. Cantrell ultimately concluded that the fair market value of the 8.08 acres as of March 2010 was $1,703,000.00.
Dr. Wade Ragas had a similar valuation process. He noted that since 1956, the property had been a part of the airport inside an air transportation corridor. He likewise found that the highest and best use of the 8.08 acres was airport-related development, or assemblage with the existing airport facilities. ■ Dr. Ragas reviewed comparable sales involving nearby vacant land that had a commercial industrial use in close proximity to the airport, but that did not directly benefit from the airport such as runway proximity. Dr. Ragas considered eight comparable property sales and adjusted for plottage value by adding a premium of 20%. He also deducted for the fill and demucking previously done by NOAB. Dr. Ragas opined that the fair market value of the 8.08 acres in March 2010 was $1,457,000.00.
NOAB countered Mr. Cantrell and Dr. Ragas’ expert opinions with that of its experts, Henry Tatje and Jimmie Thorns, Jr. Mr. Tatje explained that he valued the property in the condition it was in at the time of the appropriation, which was partially a canal bottom and partially unimproved wetlands. In determining the highest and best use of the property, Mr. Tatje ignored the adjoining public project for which it was being purchased. Rather, he determined the highest and best use of the land in the context of the general market place and without any consideration of the airport’s influence on the property. Within these parameters, Mr. Tatje found the highest and best use of the property to be “long-term speculation as a wetland tract with inner muses for recreational uses, possibly, with the possibility that some time in the future, it might be developed.”
RMr. Tatje considered several comparable wetland sales. He valued the property without regard to NOAB’s use of the property, the value the property had to NOAB, or any improvements NOAB had already made to the property. Mr. Tatje disagreed with Mr. Cantrell and Dr. Ragas’ addition of a premium for plottage value, explaining that plottage value is improper for appraising property that a public entity is looking to buy. He further disagreed with Mr. Cantrell and Dr. Ragas’ classification of the property as being within a transportation corridor. He explained that corridor valuation is used for property that enables a user to run a pipeline or railroad a long distance to get from one point to the next. Mr. Tatje stated he has never seen the concept of corridor valuation used to appraise property within the vicinity of an airport. Mr. Tatje ultimately valued the 8.08 acres at $27,500.00.
The biggest discrepancy between the testimonies of Mr. Tatje, Mr. Cantrell and Dr. Ragas was that Mr. Tatje valued the property as “wet,” or undeveloped and outside levee protection, and Mr. Cantrell and Dr. Ragas both valued the property as “high and dry,” or cleared and filled and within the protection of a levee system. Mr. Tatje specifically testified that he did not have an opinion as to which way the property should be valued, “high and dry” or “wet,” and explained that he was simply instructed to value the property as “wet.” Conversely, Mr. Cantrell and Dr. Ragas explained that they valued the property as “high and dry” because regardless of whether NOAB had ever expanded the runway and constructed a levee, the property would have nonetheless been protected by a levee under the federal levee project, or the Lake Ponchartrain Hurricane Protection Plan.
*134 NOAB’s second appraisal expert, Jimmie Thorns, Jr., testified that he was specifically instructed by NOAB to value the property as “high and dry.” With this assumption that the property was “high and dry,” Mr. Thorns determined the 17highest and best use of the subject property was light industrial or commercial property. He explained that according to the Department of Transportation and Development and airport regulations, the land must be appraised without giving any consideration to the existence of the airport. After considering several comparable sales, Mr. Thorns concluded that the value of the 8.08 acres as “high and dry” was $563,000.00.
On rebuttal, the Landowners presented the testimony of yet another real estate appraisal expert, Bennett Oubre. Mr. Ou-bre testified that he was retained solely to review Mr. Tatje’s and Mr. Thorns’ appraisals. He disagreed with Mr. Tatje’s valuation of the subject property as “wet.” He stated that Mr. Tatje’s assumption that the properly was “wet,” or outside the levee protection system .was not credible based upon the government’s anticipated high-level flood protection plan that was well-known in the real estate market in 1987. Mr. Oubre further criticized Mr. Thorns’ “dry” appraisal on the basis it excluded consideration of the airport as being part of the market for the properly.
The trial court took the matter under advisement and rendered a judgment on August 8, 2013, finding NOAB liable for payment of just compensation in the amount of $30,740.00, plus legal interest from March 1, 2010 until paid.[3] In its reasons for judgment, the trial court found the subject property was unimproved wetlands and canal bottom that was outside any hurricane protection system at the time of the taking. It noted the Landowners had presented no competent evidence that the 8.08 acres would have been included in the Army Corps of Engineers’ planned hurricane protection system for St. Charles Parish. Conversely, the trial court found NOAB demonstrated that it anticipated providing and ultimately Isprovided hurricane protection for the runway extension, which included the 8.08 acres, at its own expense.
The trial court also concluded that had the 8.08 acres not been included in the runway extension project, the property would not have qualified for a permit to allow development of the wetlands. The trial court further determined the Landowners were not entitled to benefit from any increase in value to the property resulting from the proposed runway project or from any improvements made by NOAB.
The trial court concluded the property should be valued in its condition at the time of the taking, which it determined to be unimproved, unprotected wetlands and canal bottom. As such, the trial court stated that it found Mr. Tatje’s testimony to be more persuasive and credible.[4]
*135 After the trial court rendered judgment on just compensation, a hearing was held to determine attorney’s fees, expert costs and court costs. In a subsequent judgment, the Landowners were awarded $40,000.00 in attorney’s fees, $14,000.00 in expert costs and $7,015.50 in court costs.[5]
The Landowners appeal the trial court’s determination of just compensation and seek an increase of attorney’s fees.

ISSUES

On appeal, the Landowners contend the trial court committed legal error in determining just compensation and, thus, argue that this Court should conduct a de | flnovo review. In particular, the Landowners maintain the trial court failed to apply the scope of the project rule and enhanced value corollary set forth in U.S. v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). The Landowners assert that the trial court’s failure to apply these applicable legal principles allowed it to improperly rely on Mr. Tatje’s legally flawed opinion, which did not consider the proximity of the subject property to the airport and failed to consider the east-west runway project as an expansion of the original airport project.
The Landowners further argue the trial court erred in finding that it was unlikely they could obtain a wetlands permit to develop the property and that the subject property was not within a hurricane protection system at the time of the appropriation.

LAW & ANALYSIS

At the time of the 1987 taking, Louisiana Constitution, Article I, § 4 provided, in pertinent part:[6]
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purpose and with just compensation paid to the owner, or into court for his benefit.... In every expropriation, a party has a right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.
When a landowner suffers a taking or damage in the absence of an expropriation proceeding, he may seek compensation through an inverse condemnation action. Constance v. State ex rel. Department of Transp. & Dev., 626 So.2d 1151, 1156 (La.10/28/93); Reymond v. State Through Dept. of Highways, 255 La. 425, 231 So.2d 375, 446-47 (La.1970).
|inThe compensation for landowners in an inverse condemnation proceeding is the same as in expropriation cases: the owner is entitled to the market value of his property. Adams v. Caddo Parish, 43,047 (La.App. 2 Cir. 3/19/08); 978 So.2d 1202, 1208. The value of the appropriated prop *136 erty is to be determined as of the time of the taking. Id.
In all expropriation cases, the court must determine, as required by our constitution, the “full extent of loss” suffered by the landowner. While there is no specific formula to determine the “full extent of the loss,” La. R.S. 19:9 provides some guidance. Exxon Pipeline Co. v. Hill, 00-2535 (La.5/15/01); 788 So.2d 1154, 1159. La. R.S. 19:9 provides, in pertinent part:
In determining the value of the property to be expropriated, and any damages caused to the defendant by the expropriation, the basis of compensation shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any general or specific benefits derived by the owner from the contemplated improvement or work.
Our courts have accepted the fair market value of the property as a consideration in determining just compensation. Fair market value is defined as “the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law.” Exxon Pipeline, 788 So.2d at 1160. In determining fair market value of the property taken in an expropriation case, consideration is to be given to the most profitable use to which the land can be put by reason of its location, topography, and adaptability, also known as the “highest and best use” doctrine. Id.
Factors to be considered in determining the “highest and best use” of the taken property include: (1) market demand; (2) proximity to areas already developed in a compatible manner with the intended use; (3) economic Indevelopment in the area; (4) specific plans of business and individuals, including action already taken to develop the land for that use; (5) scarcity of the land available for that use; (6) negotiations with buyers interested in the property taken for a particular use; (7) absence of offers to buy the property made by the buyers who put it to the use urged; and (8) the use to which the property was being put at the time of the taking. Exxon Pipeline, 788 So.2d at 1160.
The current use of the property is presumed to be the highest and best use, and the landowner bears the burden of proving the existence of a different highest and best use based on a potential, future use. Id. While a landowner is entitled to compensation based on a potential use of the property even though the property is not being so utilized at the time of the taking, he must show that “it is reasonably probable that the property could be put to this use in the not too distant future, absent the expropriation and project for which the land was expropriated, and provided such a use would have an effect on the price a buyer is willing to pay.” W. Jefferson Levee Dist. v. Coast Quality Construction Corp., 93-1718 (La.5/23/94); 640 So.2d 1258, 1273. If the landowner demonstrates that the potential future use is within the reasonably near future, he is entitled to compensation on the basis of such use notwithstanding the property is not being utilized for such use at the time of the taking. Id.
In an expropriation or inverse condemnation proceeding, the trial judge’s factual determinations as to the value of the property taken will not be disturbed on review absent manifest error. Coast Quality, 640 So.2d at 1277; Borgnemouth Realty Co. v. Parish of St. Bernard, 13-1651 (La.App. 4 Cir. 5/21/14); 141 So.3d 891, 902, writs denied, 14-1285 (La.9/26/14); 149 So.3d 266, and 14-1351 (La.9/26/14); 149 So.3d 269. In order to reverse the trial court’s factual determina *137 tions, the reviewing court must find l^that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Coast Quality, 640 So.2d at 1278. A reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s findings; it must review the entirety of the record to determine whether the trial court’s findings were clearly wrong. Id.
Where documents or objective evidence contradict a witness’s testimony so that a reasonable factfinder would not credit that witness’s testimony, the reviewing court may find manifest error even in a finding purportedly based upon a credibility determination. Coast Quality, 640 So.2d at 1278. Additionally, a reviewing court is not required to affirm the trial court’s refusal to accept as credible uncontradict-ed testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection. Id., quoting Dabog v. Deris, 625 So.2d 492, 493 (La.1993). If the reviewing court finds that manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire and render a judgment on the merits. Bell-South Telcoms., Inc. v. Bennett Motor Express, L.L.C., 13-438 (La.App. 5 Cir. 12/12/13); 131 So.3d 236, 242, citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Upon review of the record in its entirety, we find the trial court committed manifest error in valuing the property at issue as unimproved wetlands and canal bottom outside the levee protection system, or “wet.” The first step in valuing appropriated land is to determine the highest and best use of the property. As discussed above, the current use of the property is presumed to be the highest and best use. However, the landowner may overcome this presumption by proving a Indifferent highest and best use based on a potential, future use. See Exxon Pipeline, supra.
At the time the property was appropriated, the 8.08 acres of land was not protected by a levee system and was considered “wet.” However, as part of NOAB’s runway expansion, NOAB constructed a levee that protected the property at issue. At trial, the Landowners offered evidence that the 8.08 acres of land would have been protected by a levee regardless of NOAB’s runway expansion project. Specifically, the Landowners offered documentary evidence that a levee, protecting the 8.08 acres, was to be constructed as part of a federal hurricane protection project. Mr. Bennett Oubre, one of the Landowners’ appraisal experts, even testified that the anticipated federal levee system was well-known in the real estate market in 1987. The Landowners also presented evidence that although NOAB ultimately built the levee around the property, NOAB had to coordinate its efforts with the Army Corps of Engineers to align the levee with the federally planned levee system before it could obtain the required permits. Thus, the Landowners showed that the future use of the property was “high and dry.”
The trial court stated that it did not find the Landowners presented competent evidence that the anticipated federal levee system would have protected property at issue. However, the Landowners’ evidence on this issue was uncontroverted. While NOAB presented evidence that it ultimately built a levee protecting the 8.08 acres, it never offered any evidence to controvert expert testimony that the property would have been protected by the anticipated federal levee system regardless of the runway expansion project. Uncon-troverted evidence should be taken as true *138 to establish a fact for which it is offered absent any circumstances in the record casting suspicion as to the reliability of this evidence |14and sound reasons for its rejection. Earls v. McDowell, 07-17 (La.App. 5 Cir. 5/15/07); 960 So.2d 242, 248.
We further note that neither of NOAB’s experts had any opinion as to whether the land should be valued as “wet” or “high and dry,” but rather both experts simply valued the land as “wet” or “high and dry” upon instruction by NOAB. Conversely, the Landowners’ experts explained the reason the land should be valued as “high and dry,” which was because the land was to be within the planned federal levee system.
Because we find the trial court was manifestly erroneous in valuing the appropriated property as “wet,” we conduct a de novo review of the record to determine the amount of just compensation owed by NOAB.
Three experts offered opinions on the valuation of the land as “high and dry” — Mr. Cantrell, Dr. Ragas, called by the Landowners, and Mr. Thorns, called by NOAB. Mr. Cantrell and Dr. Ragas both agreed that the “highest and best use” of the property as “high and dry” was airport related, while Mr. Thorns believed the “highest and best use” of the land was light industrial or commercial. Upon review, we find Mr. Thorns’ valuation to be most credible. In particular, we find that both Mr. Cantrell and Dr. Ragas erred in enhancing the value of the appropriated property by increasing the value of the property by considering the property was a key parcel needed for complete assemblage of the airport complex. As discussed above, the value of the land is to be fixed with reference to the loss sustained by the owner and not as enhanced by the purpose for which it was taken.[7] Exxon Pipeline, 788 So.2d at 1161. The subject property was taken for airport purposes; specifically, the expansion of a runway. Thus, the value of the property cannot be enhanced by considering this use.
In accordance with this principle, Mr. Thorns stated he did not consider the presence of the airport in valuing the property, but rather considered other property in proximity to the subject property. Specifically, Mr. Thorns testified as follows:
COUNSEL FOR NOAB:
In reaching your value conclusion, did you include any premium that the Airport might have been forced to pay because it needed that parcel to finish, to complete the assemblage of the property needed for the extension of the east-west runway?
*139 MR. THORNS:
No. At no time was there any consideration given to the Airport as being the beneficiary or the possible user or the purchaser of the property [sic] was appraised as if it was an arm’s length market sale.
COUNSEL FOR NOAB:
When you valued it, you didn’t include any additional value the property might have to the Airport as compared to any other purchaser?
MR. THORNS:
No.
As noted above, proximity to areas already developed in a compatible manner with the intended use is a proper factor in determining fair market value. Mr. Thorns opined that the value of the 8.08 acres was $563,000.00. However, he did not deduct any amount for the costs NOAB incurred in clearing and filling the land. Dr. Ragas valued the fill to be $65,420.00. Thus, we find the just compensation owed by NOAB to the Landowners for the appropriated land to be $497,580.00.
|1f;The Landowners ask that in the event this Court increases the amount of compensation owed, we increase the award for attorney fees. Attorney fees are awarded on a case-by-case basis after considering the following factors: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court’s own knowledge. Rivet v. State, Dept. of Transp. & Dev., 96-145 (La.9/5/96); 680 So.2d 1154, 1161.
The trial court awarded $40,000.00 in attorney fees after it determined the just compensation owed for the land was $30,740.00. Since we have determined the proper compensation owed is $497,580.00, we find that an increase of attorney fees is warranted. Considering the above factors, we find that the proper amount of attorney fees owed by NOAB to the Landowners to be 25 % of the compensation owed, which is $124,395.00. See Naquin v. Dept. of Transp. & Dev., 604 So.2d 62, (La.App. 1st Cir.1992), writ denied, 608 So.2d 169 (La.1992)(1/3 of the compensation owed awarded as attorney fees in an inverse condemnation case found to be justified); Mathis v. DeRidder, 599 So.2d 378 (La.App. 3rd Cir.1992)(25% of the award for the taking of land found to be reasonable); Pillow v. Board of Comm’rs, 425 So.2d 1267 (La.App. 2nd Cir.1982)(1/3 of the compensation owed awarded as attorney fees in an inverse condemnation suit found to be reasonable).

DECREE

Based on the foregoing, we amend the August 8, 2013 judgment awarding just compensation owed by NOAB to the Landowners from $30,740.00 to $497,580.00. Additionally, we amend the October 15, 2013 judgment awarding 117attomey fees to the Landowners from $40,000.00 to $124,395.00. In all other respects, these two judgments are affirmed.

AMENDED IN PART; AFFIRMED AS AMENDED.

. The 1962 Act of Sale showed that George E. Burgess, J. Edgar Monroe, Frank J. Montel-eone, Jr., William A. Monteleone, and Ruth Aleman sold to the City of New Orleans two parcels of land situated in St. Charles Parish west of the boundary line between Jefferson and St. Charles Parishes, described as total *132 ing 204.67 acres for a price of $153,500, or $750 per acre.

. The parties agreed that the amount of attorney's fees, expert fees and costs were to be considered by the trial court at a hearing after the trial court rendered a judgment on compensation.

. Pursuant to a pre-trial stipulation between the parties, the trial judge also awarded rental value at 7.5% of the just compensation, per annum, from April 2, 1987 to March 1, 2010. That portion of the judgment is not an issue on appeal.

. We note that Mr. Tatje testified that the value of the 8.08 acres was $27,500. In its reasons for judgment, the trial court noted that Mr. Tatje valued the property at $3,800 per acre. We do not find the record supports this factual conclusion. Mr. Tatje never gave a per acre value, but rather gave a total value of $27,500. Even assuming Mr. Tatje testified that the property was valued at $3,800 per acre, the total value for the 8.08 acres would be $30,704, not $30,740 as awarded in the judgment. Neither party complains of this discrepancy nor challenges thé award on this basis.

. In the original October 15, 2013 judgment, the trial court totaled the award as $51,515.50. In an unopposed motion to amend, the Landowners moved to have the judgment amended to $61,515.50, claiming that the addition of the $40,000 attorney's fees, $14,000 expert fees, $5,000 other litigation costs, and $2,015.50 court costs totaled $61,515.50 and not $51,515.50. We find neither calculation correct as the addition of attorney's fees, expert fees, other litigation costs and court costs as awarded in the October 15, 2013 judgment total $61,015.50.

. This section of the Constitution has been amended several times since 1987, but none of the subsequent amendments affect the substantive law applicable to this case.

. We note that the Landowners argument relating to the scope of the project and enhance corollary rule is misplaced. The general rule is that the value of the property expropriated should be fixed considering the property as of the time of the taking but not as enhanced by the purpose of the taking. An exception applies where the expropriated property was not included within the scope of the project from the beginning, and the project was subsequently enlarged to include that additional properly, or if the subsequent expropriating was for a separate endeavor, then the landowner has been held entitled to receive compensation for his land at the enhanced value added to the property by reason of its proximity to the initial improvement. State ex rel. Department of Highways v. Wax, 295 So.2d 833, 835 (La.App. 1st Cir.1974), writ denied, 299 So.2d 800 (La.1974), citing U.S. v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). This rule contemplates a second taking of property for the completion or expansion of the original project. Here, there was no second taking. To the contrary, everyone believed, as stipulated by the parties, that the 8.08 acres had been purchased by NOAB in the 1962 Act of Sale. This matter involves an inadvertent oversight, not a second taking for the completion or expansion of the original project.